# 23-7596

## In the United States Court of Appeals
### FOR THE SECOND CIRCUIT

MEXICO INFRASTRUCTURE FINANCE, LLC,

*Plaintiff – Appellee*,

v.

THE CORPORATION OF HAMILTON,

*Defendants – Appellant.*

THE BANK OF NEW YORK MELLON,

*Defendant.*

On Appeal from the United States District Court for the
Southern District of New York, No. 17-cv-6424, Hon. Denise L. Cote

## BRIEF OF THE CORPORATION OF HAMILTON

Kenneth I. Schacter
Simon Chang
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000

David B. Salmons
Brendan J. Anderson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-3000

*Counsel for The Corporation of Hamilton*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, Appellant The Corporation of Hamilton states that it does not have a parent corporation and no publicly held corporation owns more than 10% of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ i

INTRODUCTION ............................................................................................. 1

JURISDICTIONAL STATEMENT ................................................................... 5

ISSUES PRESENTED ...................................................................................... 6

STATEMENT OF THE CASE .......................................................................... 6

I.    Factual Background. ................................................................................. 6

    A.    The Development Agreement ....................................................... 7

    B.    MIF's Bridge Loan ....................................................................... 8

    C.    The Escrow Agreement's Drawdown Mechanics ..................... 10

    D.    Background to the Loan Transaction ......................................... 12

        1.    Hamilton's Legal Authority Is Repeatedly Placed in Doubt ............................................................................... 12

        2.    The Parties Fail to Obtain Legislative Approval for the Escrow Agreement .............................................. 13

    E.    The Escrow Drawdowns ............................................................ 15

    F.    Bermuda Lawsuits and Proceedings .......................................... 17

    G.    The Decisions in the Guarantee Case ........................................ 18

II.    Procedural Background .......................................................................... 20

SUMMARY OF ARGUMENT ....................................................................... 24

STANDARD OF REVIEW ............................................................................. 27

ARGUMENT .................................................................................................. 28

I.    The Escrow Agreement was *Ultra Vires* and Therefore Unenforceable. ...................................................................................... 28

## TABLE OF CONTENTS
### (continued)

Page

A. The Escrow Agreement Was Incidental to the Loan, Not to Hamilton's Land Powers or the Development Agreement. ...............29

B. There Is No Relevant Distinction Between the Escrow Agreement and the *Ultra Vires* Guarantee. ........................................35

II. The Escrow Agreement was *Void Ab Initio* Under Section 20(1A) of the 1923 Act Because It Did Not Receive Legislative Approval ................38

A. The District Court's Holding that the Escrow Agreement Was Reasonably Incidental to, Yet Not Related to, the Development Agreement Is Contradictory. ...............................................40

B. The Escrow Agreement Is Related to the Mortgage. .........................43

III. The District Court Abused Its Discretion by Refusing to Dismiss This Case on Comity and *Forum Non Conveniens* Grounds. .............................44

A. This Case Should Be Dismissed on International Comity Grounds. ............................................................45

B. This Case Should Be Dismissed for *Forum Non Conveniens*. ..........51

1. The District Court Incorrectly Relied on the Forum-Selection Clause. .......................................................53

C. When the Forum Selection Clause Is Given Its Proper Weight, the Analysis at Each Step of the *Forum Non Conveniens* Analysis Requires Dismissal. ...............................................55

CONCLUSION ...................................................................60

CERTIFICATE OF COMPLIANCE ....................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguinda v. Texaco, Inc.,*
303 F.3d 470 (2d Cir. 2002) ..................................................................52

*Allstate Life Ins. Co. v. Linter Grp. Ltd.,*
994 F.2d 996 (2d Cir. 1993) ..........................................26, 47, 48, 50

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.,*
571 U.S. 49 (2013)...............................................................................59

*BlackRock, Inc. v. Schroders PLC,*
2007 WL 1573933 (S.D.N.Y. May 30, 2007) .....................................58

*Bugliotti v. Republic of Argentina,*
952 F.3d 410 (2d Cir. 2020) ................................................................27

*Calavo Growers of Cal. v. Generali Belgium,*
632 F.2d 963 (2d Cir. 1980) ................................................................59

*Carey v. Bayerische Hypo-Und Vereinsbank AG,*
370 F.3d 234 (2d Cir. 2004) ..........................................................27, 56

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,*
433 F.2d 686 (2d Cir. 1970) ................................................................28

*Caspian Invs., Ltd. v. Vicom Holdings, Ltd.*
770 F. Supp. 880 (S.D.N.Y. 1991) ......................................................49

*DeYoung v. Beddome,*
707 F. Supp. 132 (S.D.N.Y. 1989) ......................................................51

*EMA Garp Fund, L.P. v. Banro Corp.,*
783 F. App'x 82 (2d Cir. 2019)............................................................51

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru,*
665 F.3d 384 (2d Cir. 2011) ....................................................27, 53, 54

*Hilton v. Guyot,*
159 U.S. 113 (1895)..............................................................................45

iv

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Inc. Vill. of Atl. Beach v. Kimmel*,
   18 N.Y.2d 485 (1966) ................................................................28

*Iragorri v. United Techs. Corp.*,
   274 F.3d 65 (2d Cir. 2001) .......................................................52

*Kato v. Ishihara*,
   239 F. Supp. 2d 359 (S.D.N.Y. 2002) ......................................58

*Martinez v. Bloomberg LP*,
   740 F.3d 211 (2d Cir. 2014) ...............................................54, 59

*McCarthy & Stone (Devs.) Ltd v Richmond upon Thames London*
   *Borough Council*
   [1992] 2 AC 48 (HL) (appeal taken from Eng. and Wales) ........33, 34

*Mitchell v. Garrison Protective Servs., Inc.*,
   819 F.3d 636 (2d Cir. 2016) .....................................................27

*MLC (Bermuda) Ltd. v. Credit Suisse First Boston Corp.*,
   46 F. Supp. 2d 249 (S.D.N.Y. 1999) ...................................48, 50

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   416 F.3d 146 (2d Cir. 2005) .............................................52, 55, 56

*Ole Media Mgmt., L.P. v. EMI Apr. Music, Inc.*,
   2013 WL 2531277 (S.D.N.Y. June 10, 2013) ........................45, 46

*Owens, et al. v. Turkiye Halk Bankasi A.S.*,
   2023 WL 3184617 (2d Cir. May 2, 2023) (unpublished).........53, 58

*PHL Variable Ins. Co. v. Town of Oyster Bay*,
   929 F.3d 79 (2d Cir. 2019) .......................................................28

*Piper Aircraft Co. v. Reyno*,
   454 U.S. 235 (1981)...................................................................56

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*R (Quintavalle) v the Sec'y of State for Health*
  [2003] UKHL 13, [2003] 2 AC 687 (appeal taken from Eng. and
  Wales) ........................................................................................42

*R v Luckhurst (Respondent)*
  [2022] UKSC 23) ........................................................................39

*Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*,
  466 F.3d 88 (2d Cir. 2006) ...................................................*passim*

*Rudersdal v. Harris*,
  2021 WL 2209042 (S.D.N.Y. Feb. 27, 2021) ...................................57

*Schuler v. Rainforest All., Inc.*,
  684 F. App'x 77 (2d Cir. 2017) .......................................................46

*In re Sims*,
  534 F.3d 117 (2d Cir. 2008) ............................................................28

*Ward v Metro. Police Comm'r*
  [2005] UKHL 32, [2006] 1 AC 23 (appeal taken from Eng. and
  Wales) ...........................................................................25, 30, 31

*Williams v. Connell*,
  No. 12 CV 3593, 2017 WL 2829686 (E.D.N.Y. June 29, 2017) ......................56

*Wiwa v. Royal Dutch Petroleum Co.*,
  226 F.3d 88 (2d Cir. 2000) ............................................................52

**Statutes**

28 U.S.C. § 1291(a) ...............................................................................5

28 U.S.C. § 1330(a) ...............................................................................5

28 U.S.C. § 1441(d) ...............................................................................5

28 U.S.C. § 1603(a) ...............................................................................5

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Municipalities Act of 1923 ...............................................................*passim*

**Other Authorities**

Cross: Statutory Interpretation (Third Edition 1995, Bell & Engle) ......................39

Fed. R. Civ. P. 44 ....................................................................................27

OED Third Edition, December 2009 ......................................................39

## INTRODUCTION

Defendant-Appellant the Corporation of Hamilton ("Hamilton") governs the City of Hamilton, the capital of Bermuda.  Hamilton's powers are delineated by its originating statute—the Municipalities Act of 1923 (the "1923 Act").  Under Bermuda law, actions taken by Hamilton outside of its statutory powers are *ultra vires*.  As to Hamilton's land-disposal powers—the only municipal powers at issue in this case—Section 20(1A) of the 1923 Act further requires that agreements concerning certain dispositions of Hamilton's land and "any related agreements" receive prior legislative approval.

In 2012, Hamilton entered an agreement (the "Development Agreement") with Par-La-Ville Hotel & Residences Ltd. ("PLV") to develop land owned by Hamilton into a luxury hotel (the "Hotel Project").  The Development Agreement required that PLV obtain its own financing for the project and meet certain benchmarks, but Hamilton was not directly involved in choosing how PLV financed the project or helping PLV obtain that financing.

Two years later, PLV entered into a series of agreements with Defendant-Appellee Mexico-Infrastructure Finance LLC ("MIF") to enable PLV to obtain a "bridge" loan (the "Loan") to pay down some of its debts.  These related transaction

1

documents included a Guarantee[1] of the Loan by Hamilton, secured by a mortgage on its land (the "Mortgage"), and an Escrow Agreement, which provided that loan funds be placed into escrow at Bank of New York Mellon ("BNYM") with specified conditions for their release. As part of the Escrow Agreement, Hamilton was to give approval to BNYM before funds would be disbursed. The documents comprising the loan transaction were interrelated and collectively called the "Credit Documents."

MIF was aware and had been warned by counsel and others that Hamilton's capacity to enter the "Credit Documents" was uncertain. In addition, the Escrow Agreement was never approved by the Bermuda Legislature pursuant to Section 20(1A) of the 1923 Act, even though the Mortgage and the Guarantee were submitted to and approved by the Legislature. Ultimately, PLV fell victim to a scam: it transferred the funds released from escrow to Robert McKellar on behalf of Argyle Ltd., who absconded with them. PLV did not repay the Loan.

MIF then commenced five legal actions in Bermuda, including against Hamilton under the Guarantee. In the Guarantee litigation, the Privy Council, Bermuda's highest Court of Appeal, held that the Guarantee was *ultra vires* and therefore unenforceable against Hamilton. Particularly, the Privy Council

---

[1]   In the Loan documents this is spelled "Guaranty" but it was spelled "Guarantee" by the district court.

determined that the Guarantee was neither for a "municipal purpose" nor incidental to any of Hamilton's express statutory powers.

In 2017, MIF commenced this action against Hamilton and BNYM claiming in part that Hamilton breached the Escrow Agreement by approving the release of the escrow funds. The district court first refused to dismiss the case on comity and *forum non conveniens* grounds, even though it was obviously related to the then-ongoing Guarantee proceedings in Bermuda and principally concerned whether the Escrow Agreement, like the Guarantee, was *ultra vires*—a dispositive question of Bermuda law concerning the limited powers of a municipal corporation that should be decided by Bermuda courts. Following an abbreviated bench trial at which none of the numerous Bermuda-based witnesses appeared in person, the district court rejected Hamilton's Bermuda law defenses and held that Hamilton was liable for breaching the Escrow Agreement.

This Court should reverse. In holding that the Escrow Agreement was not *ultra vires*, the district court fundamentally misconstrued the terms and purpose of the agreement, Hamilton's role in the Loan transaction, and the controlling reasoning of the Privy Council's decision that the related Guarantee was *ultra vires*. There is no legitimate basis for distinguishing the Escrow Agreement from the Guarantee; neither agreement was for a municipal purpose or reasonably incidental to any of Hamilton's statutorily authorized powers. Moreover, MIF—a sophisticated party

3

represented by prominent Bermuda counsel—was aware of the risk that Hamilton lacked capacity to enter the Loan-related agreements. This Court should align with the reasoning of the Privy Council and hold that the Escrow Agreement, like the related Guarantee, is *ultra vires* and unenforceable.

The district court also erred as a matter of law because the Escrow Agreement was never approved by the Bermuda Legislature as a "related" agreement as required by Section 20(1A) of the 1923 Act—rendering it *void ab initio* under Bermuda law. The district court's holding to the contrary rested on the contradictory view that the Escrow Agreement could be "reasonably incidental" to the Development Agreement, yet not be "related" to it. The district court also failed to recognize the many ways in which the Escrow Agreement was "related" to the Mortgage, which independently required legislative approval under the 1923 Act. As a matter of Bermuda law, the Escrow Agreement is void *ab initio*, and the decision below must be reversed.

Lastly, this case should never have proceeded to trial because the district court should have dismissed it on international comity and *forum non-conveniens* grounds. Of at least five lawsuits MIF has filed concerning this same transaction, this is the only suit not filed in Bermuda. Comity requires deference to these other proceedings, at least one of which involving both MIF and Hamilton is ongoing. Comity also required dismissal because the primary issue in the case is an important

4

question of Bermuda law concerning the limits of municipal power that should be decided by Bermuda courts. That is especially true given the Privy Council's judgment that the related Guarantee was *ultra vires*. The district court's strained effort to distinguish the Privy Council's holding should be rejected, but at a minimum, they highlight why this case belonged in Bermuda's courts. And because this case turns on actions that wholly took place in Bermuda, ultimately involved extensive discovery in Bermuda, and centered on dispositive questions of Bermuda law with significant implications for Bermuda's citizens, it should have been dismissed on *forum non conveniens* grounds as well.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1330(a) and Hamilton properly removed this case under 28 U.S.C. § 1441(d) because it was a "civil action brought in a State court against a foreign state." Hamilton meets the definition of a "foreign state" because it is "a "political subdivision of a foreign state," 28 U.S.C. § 1603(a), specifically, the capital of Bermuda. JA30 ¶ 5. This Court has appellate jurisdiction under 28 U.S.C. § 1291(a) because on October 11, 2023 the district court issued a final judgment, JA1728, and Hamilton timely filed a notice of appeal from that judgment on October 27, 2023, JA1730.

## ISSUES PRESENTED

1.      Whether the district court erred in holding that the Escrow Agreement was not *ultra vires*.

2.      Whether the district court erred in concluding that the Escrow Agreement was not void *ab initio* for lack of legislative approval, as required by Section 20 of the 1923 Act.

3      Whether the district court erred in failing to dismiss this case on international comity grounds where the primary issue involves the extent of a Bermuda municipal corporation's power under Bermuda law and relates to several cases pending in Bermuda courts.

4.      Whether the district court erred in failing to dismiss this case on *forum non conveniens* grounds where the case involves primarily Bermuda issues, law, and witnesses, as well as several of Bermuda's sovereign interests.

## STATEMENT OF THE CASE

### I.      Factual Background.

Hamilton is a foreign municipal corporation governing the City of Hamilton. JA1417.  The City is the capital of Bermuda, a self-governing British Overseas Territory.  *Id.*  Hamilton was created and exists pursuant and subject to its Bermudian governing statute, now known as the 1923 Act.  JA1417, 1427

Hamilton's powers and authority to act are conferred under, and constrained by, the 1923 Act.  JA1427.

### A. The Development Agreement

On April 11, 2012, Hamilton entered into a Development Agreement with PLV.  JA1417.  PLV is a private Bermudian development company, run by its principal, Michael MacLean.  *Id.*  Under the Development Agreement, Hamilton leased property it owned—a parking lot in the downtown area of the City (the "Property")—to PLV, and PLV was to build a five-star hotel on the Property, to be managed by Starwood/Sheraton (the "Hotel Project").  JA1417-1418.

The Development Agreement imposes certain requirements on PLV.  For instance, Section 13, titled "FINANCE AND DEVELOPMENT," required PLV to present Sheraton/Starwood with the details of a financing arrangement for constructing the Hotel Project, obtain Sheraton/Starwood's approval thereof, and deliver that confirmation to Hamilton.  The required financing arrangement was for construction of the entire Hotel Project (not for some smaller amount or other purpose), and Hamilton had no role in approving that Financing.  *See* JA590-591 at § 13; JA1588 at 103:16-18.

The scope of Hamilton's input in any approval process is specified in Sections 13.1.2 and 13.1.3.  PLV was to provide to the Bermuda Monetary Authority and Hamilton details regarding the entity that would provide the Financing, and approval

of that entity would be given by either the Bermuda Monetary Authority or Hamilton. Hamilton's approval would be limited to the identity of the Financier, not the terms of the Financing. *See* JA590-591 at § 13; JA1588 at 103:16-23.

Section 14, titled "TIMELINE FOR DEVELOPMENT," imposed various deadlines on PLV. JA591-592 at § 14. In the event of PLV's non-performance and failure to cure, Section 14 provided that the Development Agreement would be terminated. By its terms, Section 14 has nothing to do with financing or the approval of any financing. *See* JA591-592 at § 14.

On March 28, 2014, approximately two years after the Development Agreement was executed, PLV and Hamilton entered into a Deed of Variation of Development Agreement. JA1418 n.2; JA1800. The Deed of Variation acknowledged that PLV had satisfied Section 13 within the Financing Approval Period and deleted Section 13 "in its entirety." JA1801. The Deed of Variation also extended the deadlines under Section 14. JA1800.

Neither the Development Agreement nor the Deed of Variation refers to any intermediate or bridge loan, or to Hamilton's approval of any financing to be obtained by PLV.

**B.     MIF's Bridge Loan**

In July 2014, PLV entered into a series of agreements comprising the $18 million "bridge" Loan from MIF. The Loan was not for the purpose of financing the

8

Hotel Project but was instead intended to allow PLV to discharge certain debts, and to show proof of funds to lenders that might finance the entire Hotel Project. JA1419; JA79 ¶ 8.  This was a short-term loan, entered into on July 9, 2014, with a maturity date of December 30, 2014.  JA1419; JA79 ¶¶ 7-8.

To "support" the Loan, MIF required certain protections including:  (i) Hamilton's guarantee of the Loan, (ii) Hamilton's grant of a mortgage on the Property, and (iii) placement of the Loan funds in an escrow account that would control the disbursement of the funds.  JA1419; JA1812, JA1814 at 42:23-43:5, 43:13-18, and 44:11-18.

The Loan was documented in several inter-related agreements executed contemporaneously, including a Credit Agreement, Guarantee, Mortgage, Escrow Agreement, and others.  JA1420.

The Credit Agreement between MIF and PLV, dated July 9, 2014, served as the foundational agreement defining the general terms of the loan transaction.  *See* JA1744-1775; JA1814 at 42:13-22.  The Credit Agreement defines itself and the other transaction documents, including the Guarantee, Mortgage and Escrow Agreement, as the "Credit Documents"; provides that the execution of each is a condition precedent for issuance of the Loan; and further provides that a default of any Credit Document is deemed a default under the Credit Agreement.  *See* JA1744-1748 at § 1.1, 1751 at § 6.1(i), 1764 at § 10.1(ii).

The Guarantee, also dated July 9, 2014, was given by Hamilton to MIF. It references the Credit Agreement and provides that Hamilton will guarantee PLV's payment obligations under the Loan. *See* JA1737 at § 1.

The Escrow Agreement, also dated July 9, 2014, was among PLV, MIF, Hamilton, and BNYM, as escrow agent. JA371-387. It refers to the Credit Agreement as the "Underlying Agreement," adopts the defined terms therein, and provides that a default under any Credit Document can trigger a Default Notice under the Escrow Agreement. JA375 at § 3.6.

The Mortgage, dated August 4, 2014, was given by Hamilton to MIF. It incorporates the terms of the Credit Agreement and the Escrow Agreement and requires following the provisions of the Escrow Agreement in order to declare a default and enforce the Mortgage on the Property. *See* JA1778 at Whereas clauses (vii) and (viii), JA1786-1787 at § 4(a).

### C.    The Escrow Agreement's Drawdown Mechanics

The Escrow Agreement governs the release and disbursement of the Loan proceeds. JA371-387. The amount MIF deposited into escrow was $15,449,858. JA1433. The difference between this deposited amount and the $18 million face amount of the Loan—$2,550,142— comprised fees and interest that MIF deducted upfront. JA1433; JA1572 at 87:13-25.

Under the Escrow Agreement:

- PLV was entitled to an "Initial Drawdown" of $1,200,000, upon the satisfaction of certain conditions, such as MIF obtaining title insurance for the Mortgage.  JA374 at § I.3.1; JA1433.

- $500,000 was to remain in escrow until the Loan was repaid in full. JA374-375 at § I.3.3(d); JA1433.

- PLV was entitled to draw down the remaining balance of $13,749,858 upon the satisfaction of certain other conditions, including:

  - PLV's delivery of a written certification to Hamilton and MIF that PLV had arranged funding/financing of either (i) $325 million (the anticipated cost for the construction of the Hotel Project), or (ii) an amount sufficient to pay back the MIF Loan;

  - PLV's delivery of the underlying financing agreements to Hamilton and, subject to certain limited exceptions, to MIF;

  - Hamilton's approval of the proposed funding/financing, such approval not to be unreasonably withheld; and

  - Joint written notice of such approval from Hamilton and PLV to BNYM, for the release of the escrowed funds.

JA374 at § I.3.3(a) and (b); JA1435.

The Escrow Agreement does not refer to the Development Agreement, and neither states nor suggests that it is intended to effectuate the Development

11

Agreement or is in furtherance of Hamilton's power to enter into the Development Agreement.

### D. Background to the Loan Transaction

Multiple issues arose in the lead up to the Loan transaction, including—most importantly—uncertainty as to whether Hamilton had the legal authority to participate in the Loan transaction and whether Bermuda statutory requirements were satisfied. JA1427.

### 1. Hamilton's Legal Authority Is Repeatedly Placed in Doubt

The primary legal issue that arose was whether Hamilton had the legal authority under its governing statutes to engage in the Loan transaction. *Id.* As a condition for extending the Loan, MIF required that Hamilton's legal counsel, Terra Law, provide a legal opinion confirming Hamilton's authority to transact and the validity of the "Credit Documents." JA1428; JA1751-1752 at § 6.1(viii). After Terra Law provided a draft legal opinion with a qualification stating that there was a risk that Hamilton's authority could be challenged, JA1428, PLV's counsel advocated to MIF's counsel that Section 23(1)(f) of the 1923 Act gave Hamilton the requisite capacity. *See* JA1797-1799. However, MIF's counsel rejected PLV's explanation, and stated that the capacity issue "has always been the problematic issue with this transaction; unfortunately, I am just not sure that section 23 advances the issue very much." JA1797.

The focus of the parties' debate regarding the source of Hamilton's capacity was entirely on whether the Loan transaction was for a municipal purpose under Section 23. The record does not reflect any indication that the parties thought or considered that Hamilton's capacity to engage in the transaction could be derived as incidental to Hamilton's specific exercise of its land powers, such as its entry into the Development Agreement.

In late 2013, the Bermuda Legislature passed the Municipalities Amendment Act 2013 (the "2013 Act"). JA1428. The amendment was apparently intended, in part, to address the *ultra vires* issue. JA1900; *see also* JA1566 at 81:8-11. Following the passage of the 2013 Act, Terra Law agreed to provide a revised legal opinion without its prior qualification. JA1429-1430. MIF's counsel, however, still had doubts, and expressed skepticism that the amendment actually resolved the issue. JA1568-JA1570 at 83:21-85:6; JA1793-1796. MIF's principal, Xavier Gonzalez, was fully aware of this uncertainty as to Hamilton's capacity to enter into the transaction. JA1564 at 79:20-24; JA1570 at 85:7-14; JA1571 at 86:7-11.

### 2. The Parties Fail to Obtain Legislative Approval for the Escrow Agreement

Section 20 of the 1923 Act requires the submission of certain agreements by Hamilton to the Bermuda Legislature and ensuing legislative approval. Without approval, the agreement is deemed "void ab initio":

(1A) **Any agreement for—**

13

\* \* \*

> (b) a lease, conveyance or other **disposition of any interest in land which is the property of the Corporation**, … for a term exceeding twenty-one years…, **and any related agreement, must be submitted in draft to the Minister for approval by the Cabinet, and be approved by the Legislature.**

. . .

> (1C) **If a Corporation purports to enter into an agreement referred to in subsection (1A), but the agreement was—**
>
> > (a) **not submitted in advance to the Minister and approved by the Cabinet; and**
> >
> > (b) **not approved by the Legislature,**
>
> **the agreement, any related agreement,** and any sale, lease, conveyance or other disposition in pursuance of the agreement, **shall be void ab initio**.
> . . .

*See* JA1431, 1466 (emphasis added).

In late 2013, certain draft agreements were submitted to the Bermuda Minister of Home Affairs for onward approval by the Legislature pursuant to the requirements of Section 20. JA1431; JA1581 at 96:1-4. At the time, the submission included earlier drafts of the Mortgage, Guarantee and Escrow Agreement. JA1431; JA1581-1582 at 96:22-97:9. MIF and its lawyers understood that the Escrow Agreement needed approval as a related agreement. JA1582 at 97:10-13.

14

No approval was given.  Instead, the Minister responded that "the Mortgage and any related agreements pertaining to the Mortgage do not need to be submitted for the approval of the Legislature under Section 20(1A) of the Act."  JA1792; JA1431-1432; JA1582-1583 at 97:14-98:5.  However, the lawyers involved in the transaction agreed that the Minister was mistaken, and could not supplant the actual requirements of the statute.  JA1432.  As a result, in 2014, a new submission was made to the Minister seeking approval under Section 20.  *Id*.  However, the new submission requested approval of only three documents: (i) the Mortgage, and, as "related agreements" to the Mortgage, (ii) the Guarantee and (iii) the Deed of Surrender of Whole.  JA1735-1736; JA1432.  The Escrow Agreement was not submitted for approval.  JA1432; JA1586 at 101:1-20.  Thus, while the Legislature approved the other "related agreements," the Escrow Agreement was never approved.  JA1586 at 101:6-8, 101:15-20.

### E.    The Escrow Drawdowns

The Loan transaction closed on July 9, 2014, and MIF funded the escrow on July 14, 2014.  JA1433.  In August 2014, after MIF secured title insurance, PLV obtained the Initial Drawdown of $1.2 million.  JA1434-1435.  The remaining drawdown of $13,749,858 (the "Final Drawdown") occurred a few months later, at the end of October 2014.  JA1440-1441.  On October 24, Hamilton and PLV sent to BNYM notices approving the Final Drawdown.  JA1437.  On October 27, BNYM

notified MIF that it had received the approval notices and that it will be releasing the Final Drawdown.  JA1439.

PLV fell victim to a scam.  After receiving the Final Drawdown, PLV's Michael MacLean transferred $12.5 million of the funds to Argyle.  JA1441. Argyle's Robert McKellar absconded with the funds.  JA1416.  MIF thought that PLV was being scammed.  On October 29, 2014 (two days after learning that the Final Drawdown was about to be released), MIF's Gonzalez emailed PLV's Michael MacLean that the transaction "was a clear… fraud" and urged him to cancel the disbursement request.  JA1970.  MIF did not share its concerns about the "clear" fraud to anyone at BNYM or Hamilton, or take any steps to halt the transaction. JA1559 at 74:13-17, JA1560 at 75:15-20, JA1562-1563 at 77:22-78:1, JA1590-1591 at 105:22-106:5, JA1592-1593 at 107:21-108:2.

The escrowed monies were lost, and the Loan was not repaid.  This was followed by multiple lawsuits and proceedings in Bermuda, and this lawsuit in the United States.[2]

---

[2]   The district court determined that the agreement with Argyle did not satisfy the requirements of the Escrow Agreement for the release of funds, and Hamilton thus breached the Escrow Agreement by approving the release of funds. Hamilton does not contest that determination for purposes of this appeal.

### F.     Bermuda Lawsuits and Proceedings

MIF commenced five lawsuits, all, except this one, in Bermuda.  In early 2015, MIF sued (in three lawsuits) PLV in Bermuda, its principal Michael McLean and his wife, and the trustees of the Skyline Trust—a trust formed by PLV to receive the Final Drawdown, claiming that the Loan proceeds were wrongfully released from escrow.   JA1443; JA202, JA203 ¶ 1, JA214-215 ¶¶ 35-42.  MIF obtained a $19,397,819 judgment against PLV and recovered a portion of it.  JA1443-1444.

Around the same time, MIF commenced a lawsuit in Bermuda against Hamilton, to enforce the Guarantee.  JA70-73; JA1444.  Hamilton initially consented to judgment, and a Consent Order was issued.  JA126-127; JA1444.  In May 2016, represented by new counsel, Hamilton brought an action in Bermuda to set aside the Consent Order on *ultra vires* grounds.  JA1444.  The history of this case is discussed in detail below.

In September 2017, MIF again sued Hamilton in Bermuda, this time seeking to enforce the Mortgage.  JA128-140.  Hamilton asserted the same *ultra vires* defense.  *Id*.  This action is ongoing.

There are also several ongoing actions related to the legal opinions given on the Loan transaction.  In March 2018, Fidelity (MIF's title insurer) sued Trott & Duncan (its counsel) in Bermuda, based on the advice/opinion the firm gave regarding the *ultra vires* issue.  JA1301-1302.  In April 2020, MIF sued Terra Law

in Bermuda.  JA1817 at 276:24-25, JA1818 at 277:1-277:6.  And, in March 2022, MIF sued PLV's counsel in Bermuda, based on their actions with respect to the Final Drawdown.  *Id*. at 277:15-278:3.

Additionally, PLV went into liquidation in Bermuda, and a receiver was appointed over Skyline Trust.  JA461 ¶ 20.

### G.    The Decisions in the Guarantee Case

On November 18, 2016, the Supreme Court of Bermuda held that Hamilton's actions in entering the Guarantee were *ultra vires*.  JA419-420 ¶ 12, JA425-427 ¶ 34. The court reasoned that the power of Hamilton to enter into the transaction hinged on whether Hamilton did so for "municipal purposes" as set forth in its empowering statute, the 1923 Act.  JA419-420 ¶ 12, JA421 ¶ 18, JA425 ¶ 33.  The court concluded that Hamilton had acted *ultra vires* because the facilitation of a hotel development by a commercial developer was not a municipal purpose.  JA425 ¶ 33.  On May 12, 2017, the Bermuda appellate court affirmed.  JA405 ¶ 38.

MIF appealed to Bermuda's court of last resort, the Judicial Committee of the Privy Council in the United Kingdom.  On January 21, 2019, the Privy Council affirmed the judgments of the two Bermuda courts and dismissed MIF's appeal. JA343 ¶ 62.

The Privy Council recognized that Hamilton had the capacity to act only for authorized purposes and powers as set forth in the 1923 Act and identified two ways

in which MIF could possibly prevail. JA338 ¶ 41. One way was to show that the Guarantee was "reasonably incidental" to an express power, such as Hamilton's permissible entry into the Development Agreement. The Privy Council firmly rejected that avenue:

> In asking whether a power is reasonably incidental to the exercise of an express power, it is necessary to examine the express power that was exercised. Here the Corporation had power to dispose of an interest in its land and was thus able to enter into the development agreement. It cannot be said that the guarantee was incidental to the execution of that agreement. The development agreement deliberately distanced the Corporation from the development. If the developer did not demonstrate within a stipulated period that it had obtained the finance needed to complete the hotel, the Corporation could terminate the development agreement and the developer would never be able to complete the development. The terms of the agreement specifically provided that the Corporation and the developer were not partners for the purpose of the hotel development.

*See* JA338-339 ¶ 42.

The only other way for MIF to prevail was to show that the entry into the Guarantee served a "municipal purpose" within the meaning of section 23(1)(f) of the 1923 Act. *See* JA326 ¶ 1, JA338 ¶ 41. After carefully considering the relevant statutory text, English common law, and Bermuda's public and governmental interests, the Privy Council ruled that "to be 'municipal', a purpose must be aimed at the provision by the Corporation of a service for the benefit of inhabitants of Hamilton." *See* JA342 ¶ 57. Because it was "clear" that Hamilton's purpose in

19

entering into the loan transaction was to "enable the developer [PLV] to obtain credit," the Privy Council concluded that this was not a "municipal" purpose for which Hamilton could have acted. *See id.* at ¶¶ 58-59. Accordingly, Hamilton had no capacity to enter into the transaction, and the Guarantee was *ultra vires* and unenforceable against Hamilton. *See id.*

## II. Procedural Background

MIF commenced this action in New York state court in 2017 alleging breaches of the Escrow Agreement (among other claims) against Hamilton and BNYM. Hamilton removed the case to federal court and moved to dismiss on grounds of comity, *forum non conveniens*, *res judicata*, and collateral estoppel. Dkt. 28. The premise of the motion was that the district court should defer to the on-going Bermuda proceedings and resulting judgments.

In March 2019, Judge Broderick denied the motion. JA225-251. In rejecting the comity and *forum non conveniens* arguments, the court relied heavily on a New York forum selection clause in the Escrow Agreement. JA233; *see* JA380 § II, ¶ 12 ("all proceedings relating [to the Escrow Agreement] shall be brought in courts located within the City and State of New York"). The court further concluded that the Bermuda judgments were not binding because they concerned the enforceability of the Guarantee, not the Escrow Agreement. JA234.

In 2019, Hamilton moved for summary judgment and judgment on the pleadings. Dkts. 88-89; JA74-77; JA126-127; JA265-364, JA371-455; Dkt. 93; Dkt. 111; JA568-731; JA1737-1777; JA1895-1905. Its principal argument was that, just as the Privy Council held the Guarantee to be *ultra vires*, the Escrow Agreement was necessarily *ultra vires* as well, being part of the same loan transaction. Dkt. 89 at 17. Hamilton further argued that MIF's tort claims should be dismissed because they were all predicated on the *ultra vires* Escrow Agreement, and because MIF's complaint otherwise failed to state these claims. Dkt. 89 at 19, 22-34.

In August 2020, Judge Broderick dismissed MIF's tort claims but declined to dismiss the breach of contract claim. JA732-755. The court accepted that the Escrow Agreement did not satisfy the "municipal purpose" requirement but decided that the agreement could be deemed "reasonably incidental" to the Development Agreement. JA749-751.

The parties then engaged in extensive international discovery—including the issuance of several letters rogatory. JA1447. The court held a one-day bench trial on June 28, 2023. JA1449. On July 5, 2023, the district court issued its decision, holding that BNYM was not liable for breaching the Escrow Agreement, but that Hamilton was. *See* JA1415-1485.

Relevant here, the district court rejected Hamilton's *ultra vires* arguments. First, it held that the Escrow Agreement was "reasonably incidental" to the

21

Development Agreement, and, therefore, fell within Hamilton's powers. The district court reasoned that because "§ 14 of the Development Agreement allowed Hamilton to terminate the Development Agreement if PLV failed to adhere to a set timeline" and "the Escrow Agreement required Hamilton to ensure that the project moved forward as planned," the Escrow Agreement was reasonably incidental to the Development Agreement. JA1463.

Second, the district court asserted that the "Escrow Agreement bears a closer resemblance to the Development Agreement in relevant respects than to the Guarantee." JA1463. Particularly: (1) the court viewed the Escrow Agreement, like the Development Agreement, as part of "Hamilton's ongoing role to oversee the project," (2) on its view, the Escrow Agreement, unlike the Guarantee, did not create liability for Hamilton on the Loan, and (3) it characterized Hamilton's relationship with PLV in the Escrow Agreement as that "of a landlord" as opposed to the "partner" it was on the Guarantee. JA1463-1464.

Third, the district court rejected Hamilton's counterarguments. It held that even if the Escrow Agreement was incidental to the Credit Agreement, the Escrow Agreement could be incidental to both the Development Agreement and the Credit Agreement. JA1464. The district court also held that the question was not whether the Escrow Agreement was reasonably incidental to Hamilton's statutory power to dispose of land, but whether it was reasonably incidental to the Development

22

Agreement. *Id.* Finally, the district court rejected Hamilton's argument that the deletion of § 13 of the Development Agreement through the Deed of Variation separated the Development Agreement from the Escrow Agreement, because, on its view, other provisions of the Development Agreement allowed Hamilton to terminate the agreement if PLV "failed to meet certain benchmarks." JA1465.

The district court also rejected Hamilton's argument that the Escrow Agreement was void *ab initio* because it was not approved by the Bermuda legislature under § 20 of the 1923 Act. *Id.* The district court concluded that although the Escrow Agreement was "reasonably incidental" to the Development Agreement for *ultra vires* purposes, it was not "related to" to the Development Agreement for purposes of the legislative approval requirement of the 1923 Act. JA1466-1468. The district court justified this apparent inconsistency by reasoning that "the terms ['reasonably incidental' and 'related'] come from different strands of Bermuda law" and that an agreement can be "reasonably incidental to a second agreement under one doctrine and not related to the agreement under a different source of law." JA1467-1468. In conclusory fashion, the court also concluded that the Escrow Agreement was not a "related agreement" to the Mortgage (which would independently require submission to the Legislature) because it was not necessary to inform the Legislature of all the terms of a disposition of land. JA1469.

23

On October 11, 2023, the district court entered a final money judgment against Hamilton in the amount of $22,472,724.51 (including prejudgment interest). JA1728-1729. On October 27, 2023, Hamilton timely filed its notice of appeal. JA1730.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's judgment holding Hamilton liable for breach of contract for four independent reasons.

First, the Escrow Agreement was *ultra vires* and therefore unenforceable against Hamilton. The district court rightly recognized both that Bermuda law governs this question and that it could enforce the Escrow Agreement only if it could distinguish the Privy Council's decision that the Guarantee, which was part of the same loan documents, was *ultra vires*. But the district court's attempts to distinguish the Privy Council's decision fail and only confirm that the decision below conflicts with the controlling reasoning of the Privy Council.

All agree that the Escrow Agreement was not for a "municipal purpose" itself; therefore, it could be within Hamilton's power only if it was incidental to the exercise of one of Hamilton's statutorily authorized powers. In holding that it was, the district court made the error of asking whether the Escrow Agreement was "incidental" to the Development Agreement, and compounded its error by concluding that it was. The correct question was whether the Escrow Agreement

24

was incidental to—meaning, in the words of the Supreme Court of the United Kingdom in a seminal 2006 decision, "necessary"[3]—to effectuate Hamilton's power to dispose of land. It was not. By its terms, the Escrow Agreement was part of the documents (including the Guarantee and the Mortgage) that formed the basis for the Loan. The Escrow Agreement's relationship to the Development Agreement, let alone to Hamilton's statutory power to dispose of its land, was indirect at best. Therefore, it is unenforceable against Hamilton.

Moreover, both the Escrow Agreement and the Guarantee were part of the same package of documents for the Loan and both served the same purpose—to support PLV in obtaining bridge financing. Both had an attenuated connection to the Development Agreement at best, and neither was necessary to Hamilton's power to dispose of land. Because the Guarantee was held to be *ultra vires* by Bermuda's highest court, the Escrow Agreement should be as well.

Second, the Escrow Agreement is void *ab initio* because, under Section 20(1A) of the 1923 Act, it was required to be approved by the Bermuda Legislature and was not. That approval is required for agreements for dispositions of land and conveyances for greater than 21 years and any "related" agreements. JA1466, JA1431. Here, the Escrow Agreement is undeniably related to the Mortgage, which,

---

[3]   *See Ward v Metro. Police Comm'r* [2005] UKHL 32, [2006] 1 AC 23 (appeal taken from Eng. and Wales)

under Bermuda law, conveyed title to the property indefinitely. The district court's contrary holding ignored the express cross-references and incorporation provisions of both the Escrow Agreement and the Mortgage. And the district court's conclusion that the Escrow Agreement was "unrelated" to the Development Agreement is fatally inconsistent with its prior holding that the Escrow Agreement was "reasonably incidental" to the Development Agreement for purposes of Hamilton's authority under the 1923 Act. Indeed, the district court held that the Escrow Agreement "dovetailed" with the Development Agreement. JA1463. MIF cannot have it both ways. If such a close connection to the Development Agreement exists, then legislative approval of the Escrow Agreement was necessary, and it is undisputed that the Legislature never approved the Escrow Agreement.

Lastly, the judgment should be reversed because the district court should have dismissed this case on comity and *forum non conveniens* grounds, rather than opining on dispositive issues of foreign law that Bermuda courts are far better suited to decide. Comity required that the district court dismiss this case in favor of several Bermuda proceedings also brought by MIF related to the same transaction. *See Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1000 (2d Cir. 1993). This is especially important given Hamilton's sovereign interests. *Id*. Additionally, this case is centered around activity in Bermuda, concerned events that occurred in Bermuda, and involved witnesses who were almost all in Bermuda. Therefore,

Bermuda was the proper forum for this case, and it should have been dismissed at the threshold. In failing to do so, the district court put too much weight on a forum-selection clause, which cannot outweigh Bermuda's sovereign interest in having the power of its municipal corporations decided by its own courts. *See Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011).

## STANDARD OF REVIEW

This Court reviews "the district court's findings of fact for clear error and conclusions of law and mixed questions de novo." *Mitchell v. Garrison Protective Servs., Inc.*, 819 F.3d 636, 641 (2d Cir. 2016) (citation omitted). The district court's foreign law determination is "a ruling on a question of law." Fed. R. Civ. P. 44. Although, the district court retains "flexibility to tailor fact-like methods of inquiry [of foreign law] to the needs of the case, Rule 44.1 ... requires law-like appellate review of foreign-law determinations." *Bugliotti v. Republic of Argentina*, 952 F.3d 410, 413-14 (2d Cir. 2020).

The district court's failure to dismiss this case on comity and *forum non conveniens* grounds is reviewed for an abuse of discretion. *Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006) (comity) [hereinafter *Royal & Sun*]; *Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (*forum non conveniens*). "A district court has abused

27

its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008).

## ARGUMENT

### I. The Escrow Agreement was *Ultra Vires* and Therefore Unenforceable.

The district court should be reversed because the Escrow Agreement was *ultra vires*. Under Bermuda law, which applies,[4] Hamilton's powers as a municipal corporation are carefully delineated in its originating statute—the 1923 Act. JA1838-1839 ¶ 26. To be within these powers, the Escrow Agreement, like the Guarantee, must either have been: (1) "reasonably incidental" to an express power conferred by the governing statutes or (2) "itself a 'municipal purpose... being [a purpose] of an extraordinary nature...' within section 23(1)(f) of the 1923 Act."

---

[4] MIF argued below that New York law applies to this question. Dkt. 216 at 34. That is incorrect. It is black-letter law that the capacity of a municipal corporation to enter into a transaction is governed by the law of the place of the corporation's creation. *See Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 698–99 (2d Cir. 1970) ("[T]he legal existence, status, identity, and domicile of a foreign corporate entity or juristic personality . . . must be determined by the laws of the country where it has been created and continues to exist."); *Inc. Vill. of Atl. Beach v. Kimmel*, 18 N.Y.2d 485, 488 (1966) ("[T]he powers of municipal corporations are such as are provided by the statutes under which they are constituted."); *PHL Variable Ins. Co. v. Town of Oyster Bay*, 929 F.3d 79, 91 (2d Cir. 2019).

JA338 ¶ 41.  All agree that the Escrow Agreement was not for a municipal purpose, JA474 ¶ 12; JA1927-28 ¶ 39; therefore, in order to be *intra vires*, the Escrow Agreement must have been incidental to a statutorily authorized power.  *Id*.

It was not.  The Escrow Agreement was at most necessary for the completion of the Loan to PLV; it was not necessary either for Hamilton to be able to exercise its power to dispose of its land or to the Development Agreement.  Indeed, contrary to the district court's determination, there is no material distinction between the Escrow Agreement and the Guarantee, which Bermuda's highest court concluded was *ultra vires.*  Therefore, the same result is necessary here:  the Escrow Agreement is *ultra vires* and unenforceable.

## A.    The Escrow Agreement Was Incidental to the Loan, Not to Hamilton's Land Powers or the Development Agreement.

The district court's analysis was flawed from the start.  The district court failed to properly analyze what the Escrow Agreement must be incidental to in order to be *intra vires*.  In the district court's view, the question was whether the Escrow Agreement was incidental to the Development Agreement.  JA1465.  But as Hamilton's expert explained, the proper inquiry is whether the Escrow Agreement is incidental to Hamilton's express power to "dispose of an interest in land"—the only statutory power the Escrow Agreement could even plausibly be related to.  JA1850 ¶ 62.  A statutory power will be construed as impliedly authorizing that which can be regarded as incidental to "the power itself."  JA1850-1851 ¶ 63.  Taken

to its logical conclusion, the district court's view would effectively allow Hamilton to unilaterally expand its statutory powers based on particular agreements it entered to carry out those powers.  JA1852 ¶ 68.  That could eviscerate the limitation on Hamilton's powers prescribed by the Legislature to protect its ratepayers.  *Id.*

The district court pointed to the Privy Council's discussion of whether the Guarantee was "reasonably incidental to the development agreement" to justify its framing of the question.  JA338 ¶ 41.  But the district court ignored the Privy Council's further statement that "[i]n asking whether a power is reasonably incidental to the exercise of an express power, it is necessary to examine the express power that was exercised"—here Hamilton's "power to dispose of an interest in its land."  JA338-339 ¶ 42.  So, the district court's refusal to require the Escrow Agreement to be reasonably incidental to Hamilton's exercise of its land-disposition power was error.

When the proper question is analyzed, the Escrow Agreement is not reasonably incidental to Hamilton's land-disposal powers.  Under the seminal case decided by the U.K. Supreme Court on implied powers of public corporations, *Ward v Metro. Police Comm'r* [2005] UKHL 32, [2006] 1 AC 23 (appeal taken from Eng. and Wales), in order to be "incidental" to an express power "[i]t is not sufficient that such a power be sensible or desirable. The implication has to be *necessary* in order to make the statutory power effective to achieve its purpose."  *Id*. at 23 (emphasis

30

added). *Ward* remains good law and is consistent with the public interest in limited executive power.

The Escrow Agreement was plainly not necessary for Hamilton to dispose of its interest in land—it had done so two years earlier, when it signed the Development Agreement. Instead, the Escrow Agreement, like the *ultra vires* Guarantee, was designed to provide additional protection to the lender (MIF) and thereby assist PLV in obtaining the Loan—nothing else. And the Loan was not even for the purpose of directly financing the Hotel Project but was instead intended to allow PLV to discharge certain debts and to show proof of funds to lenders that might provide the financing required to cover the full costs of the Hotel Project. JA1419; JA79 ¶ 8.

The terms of the loan documents confirm that they were all ultimately designed to facilitate the Loan, not to facilitate any land transaction. The Escrow Agreement is referred to in the Credit Agreement, the foundational document for the Loan, as being, along with the Guarantee, Mortgage and Credit Agreement, the "Credit Documents." JA1745, JA1751 at § 6.1(i), JA1764 at § 10.1(ii). The Credit Agreement further provides that entry into each of these Credit Documents (including both the Guarantee and the Escrow Agreement) was a condition precedent to the Loan and that a default on any of the Credit Documents would result in a default of the Credit Agreement. *Id*. The Escrow Agreement refers to the Credit Agreement as the "Underlying Agreement," adopts the defined terms therein, and

31

further provides that a default under any Credit Document can trigger a Default Notice under the Escrow Agreement. JA374, JA375 at § 3.6. The Guarantee likewise refers to the Credit Agreement and guarantees the performance of the Loan. JA1737. The Mortgage, in turn, incorporates the terms of the Credit Agreement and the Escrow Agreement, and requires action taken under the Escrow Agreement in order to enforce the Mortgage. JA1777-1778; JA1786.

The district court disregarded these connections between the Escrow Agreement and the other Credit Documents—and the absence of any such connection to the Development Agreement—because, on its view, "there is no reason why a contract cannot be incidental or ancillary to two separate agreements." JA1464 (citing Neuberger Report). That may be true as a general matter, but it misses the point here. Although there are numerous references in the Escrow Agreement to other Credit Documents, there are no references to the Development Agreement or to any disposition of land. This is unsurprising as the Escrow Agreement was signed more than two years after the Development Agreement, and as discussed further below, there is no reason to think it was necessary to carry out the terms of that Agreement, or any other land-disposal function. JA1870-1872 ¶ 112. Instead, the interrelatedness of the Credit Documents and their function and purpose of supporting the Loan to PLV (as conceded by MIF's Xavier Gonzalez),

confirm that the Escrow Agreement, just like the Guarantee, was meant to facilitate the Loan, an activity not incidental to Hamilton's land-disposal powers. *Id*.

For similar reasons, the Escrow Agreement was not necessary or reasonably incidental to the Development Agreement, even if that were the proper question. To establish the necessary link between the Development Agreement and the Escrow Agreement, the district court found that because § 14 of the Development Agreement "allowed Hamilton to terminate the agreement if PLV failed to adhere to a certain timeframe for the project" and the "Escrow Agreement required Hamilton to ensure that the project went forward as planned," the Escrow Agreement was reasonably incidental to the Development Agreement. JA1465. This reasoning is flawed for several reasons.

First, as discussed above, the Escrow Agreement was designed to ensure that the Loan—and not the Hotel Project itself—went forward as planned. This is confirmed by the fact that the Escrow Agreement refers to the Credit Agreement, not the Development Agreement, as the "Underlying Agreement." JA374, JA375 at § 3.6. Even if the Credit Agreement, as the core Loan document, was itself somehow incidental to the Development Agreement, that would at most make the Escrow Agreement "incidental to the incidental," which "does not pass the test" under Bermuda law. JA1853 ¶ 70 (quoting *McCarthy & Stone (Devs.) Ltd v Richmond*

*upon Thames London Borough Council* [1992] 2 AC 48 (HL) (appeal taken from Eng. and Wales)) (at p 70)).

Second, the district court's reasoning proves too much. Assuming that in some indirect way the Escrow Agreement would have allowed the Hotel Project to move forward on the timeline set out in § 14 of the Development Agreement because it facilitated PLV's financing, the *ultra vires* Guarantee did the same thing. Indeed, the Privy Council recognized that the "purpose of the guarantee was to help the developer obtain funding for the development"—primarily "to enable the developer to obtain credit," but held it was *ultra vires*. JA342 ¶¶ 58-59. If anything, the substantive repayment promise of the Guarantee more directly facilitated PLV's ability to obtain the Loan than the procedural terms for disbursement contained in the Escrow Agreement. It makes no sense to treat the Escrow Agreement as more connected with or fundamental to the Development Agreement than the Guarantee. In all events, because both the Escrow Agreement and the Guarantee served the same purpose and were essential parts of the same loan transaction, both are *ultra vires*.

Third, the Escrow Agreement could not have been incidental to the Development Agreement because the Development Agreement had its own separate and distinct financing provision. JA1873-1877 ¶ 116. That provision, unlike those in the Escrow Agreement and Guarantee, provided Hamilton with no role in approving the terms of the Hotel financing and no obligation to certify any such

financing to a third party. *See* JA590 at § 13.1.3 (providing Hamilton only with the ability to approve the Financier not the finance plan). Moreover, when the Escrow Agreement was signed, PLV had already satisfied these requirements in the Development Agreement and a subsequent Deed of Variation deleted them from the Agreement altogether. *See* JA1419; JA1800-1803. In these circumstances, the Escrow Agreement's completely different procedures for the release of funds to PLV, under an entirely separate financing arrangement, cannot be reasonably incidental to the Development Agreement. JA1873-1877 ¶ 116. Instead, those procedures were designed to facilitate the Loan and nothing more.

In sum, under the proper Bermuda-law standard, there is no basis for holding that the Escrow Agreement was necessary for Hamilton to exercise its land disposal powers. Nor was it necessary or reasonably incidental to the Development Agreement. It was therefore *ultra vires* and unenforceable, and the Court should reverse on this basis alone.

## B. There Is No Relevant Distinction Between the Escrow Agreement and the *Ultra Vires* Guarantee.

Contrary to the district court's conclusion, there are no material distinctions between the Escrow Agreement and the Guarantee, which the Privy Council held was *ultra vires* and unenforceable. Both agreements were entered as part of the same Loan package. JA1745, JA1751 at § 6.1(i), JA1764 at § 10.1(ii). MIF's Xavier Gonzalez conceded that they were both designed to "support" the Loan. JA1814 at

44:17-18). Indeed, they cross-reference each other and are both referred to in the Credit Agreement as the Credit Documents. JA1737. Both documents were executed on the same day. *See* JA1737 at Recitals and § 1; JA371-387. The Privy Council held that it "cannot be said that the guarantee was incidental to the execution of [the Development Agreement]." JA338-339 ¶ 42. The same is true of the Escrow Agreement.

Nevertheless, the district court pointed to what it asserted are "several factors" indicating "that the Escrow Agreement bears a closer resemblance in relevant respects to the Development Agreement than the Guarantee." JA1463. None of these is availing.

The district court first asserted that Hamilton's role in the Escrow Agreement, like in the Development Agreement, was "to oversee the ongoing work on the project" whereas its role under the Guarantee was "a financial one." *Id*. The district court fundamentally misconstrued Hamilton's role as provided for in the Escrow Agreement. That role was not to "oversee ongoing work on the project" but rather to serve as protection for the lender, MIF. JA1873-1877 ¶ 116. MIF has confirmed that very understanding throughout this case. *See* JA37 ¶ 16, JA38 ¶ 18 (explaining that the purpose of the Escrow Agreement was to protect MIF's loan disbursement). In that sense, Hamilton's role in authorizing the disbursement of the escrowed funds and its role in guaranteeing the Loan were comparable. This is confirmed by the

fact that a default on the Escrow Agreement would trigger the application of the Mortgage (used to secure the Guarantee) and could also trigger a default on the underlying Credit Agreement. *See* JA375 at § 3.6; JA378 at § 4(a). By contrast, no provision of the Escrow Agreement is referenced in, or triggers any provision of, the Development Agreement, which was signed more than two years earlier.

The district court sought to distinguish the Escrow Agreement from the Guarantee by saying the former did not create liability for Hamilton, while the latter did. JA1463. This overlooks the obvious fact that liability for the release of the loan proceeds under the Escrow Agreement is exactly what MIF is seeking to enforce in this case. Moreover, several provisions of the Escrow Agreement potentially imposed additional liability on Hamilton. JA1867-1868 ¶ 105. These include if it unreasonably withheld consent (*see* JA374 at §§ I.3.1(b), 3.3(a), 3.3(b)) and various indemnification obligations (JA379 at § II.9, JA385-386). This is in contrast to the financing provisions in the Development Agreement, where, as shown above, *supra* at 8, Hamilton had limited input and consequently limited liability on any financing decisions. These differences reflect that the Development Agreement was a transaction concerning Hamilton's disposal of its land interest, while the Escrow Agreement was part of a different transaction focused on financing.

For similar reasons, the district court was also wrong that Hamilton acted as a "landlord" in the Escrow Agreement. There is no mention of the Development

Agreement in the Escrow Agreement and Hamilton is never referred to as a landlord in the latter. Instead, the "Underlying Agreement" was explicitly defined as the Credit Agreement (to which Hamilton was not a party) but which established the Loan for which Hamilton served as a guarantor. JA373, Whereas clauses, JA375 at § 3.6.

Because there is no valid distinction between the Escrow Agreement and the Guarantee, they should be treated the same from an implied powers standpoint. The district court erred in failing to do so. This Court should reverse and hold that the Escrow Agreement was *ultra vires* and unenforceable.

## II. The Escrow Agreement was *Void Ab Initio* Under Section 20(1A) of the 1923 Act Because It Did Not Receive Legislative Approval.

Independently, the Escrow Agreement is void and unenforceable because it was not approved by the Legislature as required by Section 20(1A) of the 1923 Act. That section provides that "[a]ny agreement" affecting the "disposition of any interest in land which is the property of [Hamilton] … for a term exceeding twenty-one years … *and any related agreement*, must be submitted in draft to the Minister for approval by the Cabinet, and be approved by the Legislature" and that the failure to do so renders "the agreement, and any related agreement … *void ab initio*." (emphasis added).

Here, although the Mortgage, Guarantee, and a Deed of Surrender were all submitted for legislative approval, and approved, the Escrow Agreement was not.

JA1735-1736; JA1432. Nevertheless, the district court incorrectly, and contradictorily, held that despite being, in its view, "reasonably incidental" to the Development Agreement (a disposition of an interest in land) the Escrow Agreement was somehow not a "related agreement" requiring legislative approval. JA1468. The district court similarly held that although cross-referenced and signed around the same time as the Mortgage, the Escrow Agreement was not "related" to the Mortgage. *Id*. Both of these holdings are erroneous, but if the Court disagrees with either one, then the Escrow Agreement is void and unenforceable.

Those erroneous rulings stem from the district court's strained, and legally unsupported, interpretation of the term "related" in Section 20(1A). Under English, and Bermuda law, "the essential rule of statutory interpretation is that words should generally be given the meaning which the normal speaker of the English language would understand them to bear in the context in which they are used." JA1881-1882 ¶ 124 n.73 (citing Cross: Statutory Interpretation (Third Edition 1995, Bell & Engle), p. 1; *R v Luckhurst (Respondent)* [2022] UKSC 23)). The Oxford English Dictionary defines "related" as "connected or having relation to something else" and relation as "connection, association." *See* OED Third Edition, December 2009.

Despite the broad scope of this definition, the district court pronounced— without citing any authority—that the meaning of "related agreement" in Section 20 is limited to a "'side agreement' in a conveyance, such as an agreement adjusting

the rent in a lease." JA1467. That view is too narrow, given the broad phrase used, and the fact that the word "related" is not qualified, and is preceded by the word "any." Nevertheless, as discussed below, the district court failed to explain why the Escrow Agreement was not related, even under its own definition, to the Development Agreement or the Mortgage.

### A. The District Court's Holding that the Escrow Agreement Was Reasonably Incidental to, Yet Not Related to, the Development Agreement Is Contradictory.

The district court's holding that the Escrow Agreement was not related to Development Agreement cannot be squared with its simultaneous holding that the Escrow Agreement was incidental to the Development Agreement. The district court justified its holding by stating—once again eschewing any Bermuda legal authority—that the terms "incidental" and "related" come from different strands of Bermuda law and that an agreement could be "reasonably incidental" "under one doctrine," "but not 'related' to the agreement under a different source of law." JA1468. The district court then posited an example of "an agreement with a service provider to paint or landscape the hotel complex on the Property, [entered] several years after the Development Agreement" which on the district court's view would be "reasonably incidental to Hamilton's power to dispose of its own land" but not a "related" agreement under Section 20. *Id*.

But even granting that the district court was correct that an agreement can sometimes be incidental to Hamilton's land-disposal powers, but not related to a particular disposition of land, that principle does not apply in these circumstances. Here, the district court did not hold that the Escrow Agreement was incidental to "Hamilton's power to dispose of its own land," nor could it; instead, it held that the Escrow Agreement was "reasonably incidental *to the Development Agreement*." JA1463. The district court rejected Hamilton's argument, set forth above, that this was not the proper analysis. *Id*. The district court emphasized that, in its view, the Escrow Agreement "dovetailed" with the Development Agreement. JA1463. Whatever might be true of separate and distinct agreements that are each connected to Hamilton's land-disposal powers, such as in the district court's example, cannot also hold true when the court has explicitly found, and relied on, a link between both agreements. JA1881-1882 ¶ 124. Although, for the reasons stated above, there is no necessary link between the Escrow Agreement and the Development Agreement, if this Court were to agree with the district court that such close connection exists, then under the plain terms of Section 20(1A) it would be bound to hold that the agreements were related. *Id*.

MIF previously argued, based on its expert report, that the term "related" in Section 20(1A) should be given a temporal limitation, such that an agreement like the Escrow Agreement, entered more than two years after the Development

Agreement, could not be related to the prior agreement.  On MIF's view, the statute contemplated a single submission to the Legislature.  But there is no temporal limitation in Section 20(1A) nor any requirement that all agreements be submitted at once.  The statute suggests the opposite by providing that "*any* related agreement" requires approval.  And, as Hamilton's expert explained, the historical circumstances of the amendment to Section 20 requiring these legislative approvals suggest that the Legislature would not have wanted a related agreement to escape approval simply because it was signed later.  JA1966 ¶ 42.  The legislative intention was to maximize governmental and legislative oversight in light of prior dissatisfaction with Hamilton's land dealings.  JA1966-1967 ¶ 42-45.  Adopting a narrow construction of these provisions would therefore be against the manifest intent of the Bermuda legislature.  JA1968 ¶ 48 (citing *R (Quintavalle) v the Sec'y of State for Health* [2003] UKHL 13, [2003] 2 AC 687 at [8] (appeal taken from Eng. and Wales)) ("… undue concentration on the minutiae of the enactment may lead the court to neglect the purpose which Parliament intended to achieve when it enacted the statute")).

The intent for strict legislative oversight is also demonstrated by the fact that the amendment to Section 20 creating the approval requirement was made retroactive to agreements entered more than a year before its enactment.  Indeed, the Development Agreement itself was submitted for legislative approval retroactively, even though it had been signed over a year before the amendment.  *Id*.  There is

therefore no reason to hold that the Escrow Agreement was not related to the Development Agreement within the meaning of Section 20(1A), and every reason to hold that it was.

The Escrow Agreement, with the significant new obligation Hamilton undertook—according to the district Court, to monitor the Hotel project by to reviewing and approving PLV's proposed permanent financing—should have been presented to the Legislature for approval, but never was. The agreement is therefore void and unenforceable.

### B. The Escrow Agreement Is Related to the Mortgage.

The Escrow Agreement is also clearly "related" to the Mortgage. The Mortgage was part of the Loan transaction along with the Escrow Agreement. The Mortgage's purpose was to secure the Guarantee of the Loan, the funds for which were deposited in escrow pursuant to the Escrow Agreement. The Mortgage cross-references the Escrow Agreement, including referring to its default notice provisions. JA1777-1778; JA1786. The Mortgage further requires that the Escrow Agreement's terms be followed as a condition precedent to its enforcement. *Id*.

Despite this clear connection between the Escrow Agreement and the Mortgage, the district court held that the Escrow Agreement was not related to the Mortgage in the "sense" that it was "not necessary to inform the legislature of all the terms of the disposition of land." JA1469. As an initial matter, that criterion begs

the question because it assumes that the correct construction of a "related" agreement is the narrow one. But even beyond that, the Mortgage explicitly demonstrates that the Escrow Agreement was part of the terms of that land disposition, because the Escrow Agreement's terms *were incorporated into the Mortgage and made a condition precedent to it*. JA1777-1778; JA1786. Therefore, even under the district court's own flawed standard, the Escrow Agreement was "related" to the Mortgage.[5]

The Mortgage was an indefinite conveyance of land that fell within Section 20(1A)'s approval requirement. That is why it was submitted and approved. Because the Escrow Agreement was undeniably related to the Mortgage, legislative approval was required and the failure to obtain it makes the Escrow Agreement void.

### III.    The District Court Abused Its Discretion by Refusing to Dismiss This Case on Comity and *Forum Non Conveniens* Grounds.

The district court should also be reversed because it erred in allowing these proceedings to go forward at all. MIF's case against Hamilton involves key threshold issues of foreign law about the capacity of a foreign municipality and the requirements of a Bermuda statute. The vast majority of the documents and

---

[5]    The district court also speculated that the Mortgage may not have required legislative approval to begin with because it was for a term of less than 21 years and a Bermuda Minister had suggested that the Mortgage did not need to be submitted for Approval. JA1468 n.14. But this is contrary to the view of all of the parties, including MIF. *Id*. Even MIF's legal expert acknowledges that a mortgage in Bermuda involves the indefinite conveyance of the land, which can only be reconveyed if the loan is repaid. JA1940-1941 ¶ 72.

witnesses were in Bermuda. Moreover, several other proceedings have been initiated concerning this same transaction and all except this one have been in Bermuda. In these circumstances, the district court should either have dismissed the case on comity or *forum non conveniens* grounds, and its failure to do so greatly prejudiced Hamilton.

**A.     This Case Should Be Dismissed on International Comity Grounds.**

The district court should have dismissed this action out of respect for ongoing related proceedings in Bermuda each involving fundamental questions of whether Hamilton, a Bermuda municipality, had the authority to enter agreements related to the same transaction. The doctrine of international comity allows a court to dismiss an action that is technically within its jurisdiction where concerns about "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience" require dismissal. *Royal & Sun*, 466 F.3d at 92 (quoting *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895)). Where, as here, the issue involves parallel proceedings several factors are to be considered: "[1] the similarity of the parties and issues; [2] the interests of judicial economy; [3] the order in which the actions were filed; [4] the adequacy of the alternative forum; and [5] the convenience of, and potential prejudice to, either party." *Ole Media Mgmt., L.P. v. EMI Apr. Music, Inc.*,

2013 WL 2531277, at *3 (S.D.N.Y. June 10, 2013) (citing *Royal & Sun*, 466 F.3d at 94).

Importantly, "[t]his list is not exhaustive, and a district court should examine the 'totality of the circumstances,'…to determine whether the specific facts before it are sufficiently exceptional to justify abstention." *Royal & Sun*, 466 F.3d at 94. But where those factors are satisfied and "exceptional circumstances" exist "such as a foreign nation's interest in uniform bankruptcy proceedings" the case should be dismissed. *Id.* at 95.

As an initial matter, the district court failed to consider Hamilton's argument that it did not even need to look to the ongoing parallel proceedings in Bermuda, because the court should have deferred to the Privy Council judgment. Where recognition of a foreign judgment is at issue, the court need not consider all of the other comity factors for parallel proceedings and may simply ask whether it should defer to a foreign court. *Schuler v. Rainforest All., Inc.*, 684 F. App'x 77 (2d Cir. 2017). Indeed, in *Schuler*, this Court affirmed the dismissal of an action in deference to a Mexican court judgment that was affirmed on appeal. The Court reasoned that the plaintiffs are "essentially asking an American court to overrule" a foreign judgment, and that "principles of comity preclude [the Court] from doing so." *Id*. at 79. As in *Schuler*, by bringing this action, MIF is seeking to make an end-run around a foreign court judgment, affirmed on appeal. Although the Privy Council

specifically concluded that the Guarantee was *ultra vires*, as shown above, there is no material distinction between that document and the Escrow Agreement for *ultra vires* purposes. Therefore, MIF should not be allowed to essentially attempt to overturn that judgment through its action here.

But aside from the Guarantee case, there are several other parallel proceedings concerning the same transaction and all except this one were brought in Bermuda. *See supra* at 17.

Instead of deferring to this substantial ongoing Bermuda litigation concerning closely related matters, the district court relied heavily on a New York forum selection clause in the Escrow Agreement. *See* JA380 § II, ¶ 12 ("all proceedings relating [to the Escrow Agreement] shall be brought in courts located within the City and State of New York"). But although courts consider a valid forum selection clause in the comity analysis, "[t]he presence of such clauses, however, does not preclude a court from granting comity where it is otherwise warranted." *Allstate Life Ins. Co.*, 994 F.2d at 1000. Here comity is otherwise warranted.

This case ultimately turns on Bermuda law, not New York law, and particularly Hamilton's capacity to enter the Escrow Agreement. In these circumstances, whether the terms of the Escrow Agreement are governed by New York law, or it contains a forum-selection clause, is irrelevant because the primary issues here do not concern the Escrow Agreement's terms but rather the scope of

Hamilton's powers as a municipal corporation. *Id*. Those are issues that Bermuda has a strong and fundamental interest in having adjudicated in its own courts. Therefore, the district court gave improper weight to the forum selection clause.

Turning to the *Royal & Sun* factors, the court found that two out of the five factors favored abstention—that Bermuda was an adequate alternative forum and that the fact that MIF's Guarantee action was filed. As to each of the other three factors, the district court made fundamental errors.

First, although the court recognized that the parties in the prior Bermuda litigation were substantially similar, it concluded that the issues in the prior Guarantee litigation were not "'substantially the same' as the issues in this action." JA234. In reaching that conclusion, the district court too mechanically looked to the fact that the Guarantee proceeding was about the Guarantee and not the Escrow Agreement. *Id*. That is not dispositive because all of the proceedings described above, and especially the Guarantee and Mortgage proceedings brought by MIF against Hamilton, are part of the same loan transaction. To satisfy this factor, these parallel proceedings need only concern "substantially the same issues," not identical issues. *Royal & Sun*, 466 F.3d at 94. Therefore, where, as here, an ongoing foreign proceeding involves the same transaction as a domestic one, courts have held that the proceedings are parallel. *See MLC (Bermuda) Ltd. v. Credit Suisse First Boston Corp.*, 46 F. Supp. 2d 249, 252 (S.D.N.Y. 1999) (holding that issues were

substantially similar because "[b]oth cases arise from the same set of transactions, and the essential controversies are squarely before the British court"; the different causes of actions pled were merely "differences of form and not of substance," and the product of the plaintiff's own choices); *Caspian Invs., Ltd. v. Vicom Holdings, Ltd*., 770 F. Supp. 880, 884 (S.D.N.Y. 1991) (holding that actions were "sufficiently similar" where both "involve[d] interpretation of the same loan agreements"). The district court erred in not reaching that conclusion here.

Second, the district court also erred in concluding that the interests of judicial economy favored retaining the lawsuit. JA235. The district court again incorrectly pointed to supposed differences between the Guarantee case and the current action. *Id*. As discussed above, these distinctions are immaterial. Instead, the district court came to a result different from the Guarantee case and the Bermuda courts will be faced with reconciling this decision in the ongoing proceedings in Bermuda, including the Mortgage case. JA74-77. The district court also pointed to the fact that, even if Hamilton were dismissed, the case would "continue here with BNYM" as a defendant and "judicial economy will be served by litigating the Escrow Agreement in a single action." JA235. But as was clear from the complaint, and eventually borne out as the litigation progressed, the claims against BNYM were distinct from the claims against Hamilton. Importantly, the threshold *ultra vires*

issue was not present in the case against BNYM. Therefore, this factor should have also weighed in favor of abstention.

Third, the district court failed to adequately consider the tremendous prejudice to Hamilton that would result, and resulted from, failing to dismiss the action in deference to the Bermuda courts. The district court relied heavily on the choice of forum clause again for this factor. JA236. But again, this is not dispositive especially when outweighed by countervailing factors. *Allstate Life Ins. Co.*, 994 F.2d at 1000. Particularly, MIF is not in a position to claim that Bermuda is an improper venue to litigate these types of claims because it has filed at least five actions related to the same transaction in Bermuda.

Moreover, because MIF's claim against Hamilton concerns Bermuda law, was about a hotel to be developed in Bermuda, and turned on the powers of a Bermuda municipal corporation, the minimal connections between MIF's suit and New York are easily overcome. *MLC (Bermuda) Ltd.*, 46 F. Supp. 2d at 254 ("[A] plaintiff's choice of forum is entitled to much less weight when it is made after the filing of a concurrent action arising out of the same series of transactions.") This resulted in substantial prejudice to Hamilton. Among other things, all of the key witnesses with knowledge relevant to the claim against Hamilton were located in Bermuda, and none testified in person at trial. As it is, this case involved extensive

international discovery, requiring the issuance of letters rogatory.  JA1447.  Under these circumstances, this factor should also have favored dismissal.

Finally, the district court failed to recognize the "special circumstances" that warrant dismissal in this case.  *Royal & Sun*, 466 F.3d at 94.  Like the foreign interest in uniformity for restructuring proceedings, which this Court agrees require dismissal on comity grounds, Bermuda's national interest in having issues concerning the powers of its municipal corporations uniformly decided in its courts is one "for which "comity is particularly appropriate."  *EMA Garp Fund, L.P. v. Banro Corp.*, 783 F. App'x 82, 83–84 (2d Cir. 2019) (citation omitted).  Because it ignored that principle, the district court entered a judgment that was inconsistent with an indistinguishable case concerning the same transaction by Bermuda's highest court.  Out of respect for Bermuda's sovereign interests, this Court should not allow that judgment to stand.  *See DeYoung v. Beddome*, 707 F. Supp. 132, 139 (S.D.N.Y. 1989) (dismissing case on international comity grounds because it "would be highly intrusive . . . to involve itself in a matter that has so heavily engaged the attention of both the executive and judicial authorities of Canada").

### B.    This Case Should Be Dismissed for *Forum Non Conveniens*.

The district court also abused its discretion in failing to dismiss this case on grounds of *forum non conveniens*.  The doctrine of *forum non conveniens* is a "discretionary device" that permits a court to "dismiss a claim even if the court is a

permissible venue with proper jurisdiction over the claim." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000). In conducting the analysis, the court engages in three steps:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. [Citation] At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. [Citation] Finally, at step three, a court balances the private and public interests implicated in the choice of forum. [Citation]

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (internal citations omitted). The private interest factors include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73–74 (2d Cir. 2001) (internal quotation marks and citation omitted). And the public interest factors include:

> administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the interest in having localized controversies decided at home; and avoiding difficult problems in conflict of laws and the application of foreign law.

*Aguinda v. Texaco, Inc.*, 303 F.3d 470, 480 (2d Cir. 2002) (citation omitted).

Contrary to the district court's holding, every step of the *forum non conveniens* analysis favors dismissal in this case. Moreover, the district court fundamentally erred by treating the New York forum selection clause in the Escrow Agreement as all but dispositive. Reversal and dismissal is therefore required.

### 1. The District Court Incorrectly Relied on the Forum-Selection Clause.

Here, the district court abused its discretion by treating the New York forum-selection clause in the Escrow Agreement as all but controlling, despite the numerous countervailing factors that showed that Bermuda, not New York, was the correct forum for this dispute.  Particularly the district court disregarded Bermuda's interest in having cases involving important national interests—here on the powers of its municipalities—litigated in its courts.  *See Owens, et al. v. Turkiye Halk Bankasi A.S.*, 2023 WL 3184617, at *5 (2d Cir. May 2, 2023) (unpublished) (affirming *forum non conveniens* dismissal in part because of "Turkey's interest in hearing an action involving an important Turkish financial institution, and the parties' choice of law dispute involving the potential application of Turkish substantive law.").  Moreover, as the outcome of this case demonstrates, the primary legal issues, witnesses, and conduct, were all centered around Bermuda.  In these circumstances, the weight the district court gave the forum selection clause was improper.

In *Figueiredo Ferraz E Engenharia de Projeto Ltda.*, 665 F.3d 384, for example, a corporation sued the Republic of Peru and its agencies in this District to confirm a $21 million arbitration award obtained against a Peruvian government agency.  *Id*.  However, a Peruvian statute capped the amount that an agency may pay annually to satisfy a judgment.  In these circumstances, this Court reversed a district

court and dismissed the case on *forum non conveniens* grounds. *Id*. The Court reasoned that the "rate at which public funds may be disbursed to satisfy public obligations is surely 'intimately involved with sovereign prerogative' and the Peruvian courts are 'the only tribunal[s] empowered to speak authoritatively' on the meaning and operation of the cap statute." *Id*. at 392.

Similarly, here, the statutory authority of Hamilton to enter into transactions is "intimately involved with sovereign prerogative" and the only tribunals empowered to speak authoritatively on it are the Bermuda courts, which have already spoken or have litigation before them. *Id*. As in *Figueiredo Ferraz E Engenharia de Projeto Ltd.*, dismissal is required for this reason alone.

But, at a minimum, these cases demonstrate that this Circuit has a policy of dismissing cases in favor of foreign forums under similar circumstances, so giving the forum-selection clause definitive weight, as the district court did here, "contravenes a strong public policy of the forum in which suit is brought." *Martinez v. Bloomberg LP*, 740 F.3d 211, 228 (2d Cir. 2014) (citing this as a reason for disregarding a forum-selection clause) (internal quotations omitted). Therefore, the district court was wrong when it suggested that Hamilton had not demonstrated a valid reason for disregarding the forum selection clause in its analysis. JA239. That conclusion led the district court to not only incorrectly give MIF's choice of forum strong deference at the first step of the *forum non conveniens* analysis, but also

essentially ignore any of Hamilton's other reasons for dismissal. This alone requires reversal.

## C. When the Forum Selection Clause Is Given Its Proper Weight, the Analysis at Each Step of the *Forum Non Conveniens* Analysis Requires Dismissal.

Along with giving too much weight to the forum-selection clause, the district court made errors at each of the three steps of the *forum non conveniens* analysis. When properly analyzed each of these steps favor dismissal.

***Deference to Choice of Forum***. Contrary to the district court's conclusion, MIF's choice of New York as a forum should not have received "deference." *Norex Petroleum Ltd.*, 416 F.3d at 153. For one thing, MIF's decision to choose New York—*after* it had lost its case on the Guarantee in Bermuda—suggests forum shopping. MIF has now commenced three actions against Hamilton based on the same underlying loan transaction, and two of the three have been in Bermuda. It has also filed at least three other cases in Bermuda against other actors in the transaction. This type of forum-shopping and harassing, repetitive litigation should not be countenanced, and negates any deference to MIF's forum choice. *See Norex Petroleum*, 416 F.3d at 155 (deference negated where the conduct is "indicative of forum shopping, that is, plaintiff's pursuit not simply of justice but of 'justice blended with some harassment,'…include 'attempts to win a tactical advantage….'").

55

MIF's choice of forum is also not entitled to deference because New York is not its home forum—it is a Delaware corporation with a principal place of business in Florida.  *See* JA237; *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 266 (1981) ("[T]he presumption [in favor of plaintiff's choice of forum] applies with less force when the plaintiff or real parties in interest are foreign.").  Moreover, MIF did not choose to file in the district court—Hamilton removed the case from state court.  *See Williams v. Connell*, No. 12 CV 3593, 2017 WL 2829686, at *8 (E.D.N.Y. June 29, 2017) ("relatively little deference" given "when a case originally brought in state court is removed by defendants) (internal quotations and citations omitted).  Finally, MIF chose to do business in Bermuda with a foreign municipality and the core operative facts—*i.e.*, the loan transaction—took place in, and are overwhelmingly focused on, Bermuda.  *See Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d at 238–39 (it was "reasonable" to require "plaintiff to litigate over such a business transaction in the country where it occurred).

***Adequate Alternative Forum***.  Although the district court held that "there is no indication that the Bermuda courts are not an adequate forum," it nevertheless questioned whether Hamilton had met its burden at this step, because, in its view, Hamilton did not "demonstrate that defendants are amenable to service of process in Bermuda and that Bermuda would permit litigation of the subject matter of the dispute."  JA241 n.17 (citing *Norex Petroleum*, 416 F.3d at 157).  But Hamilton

showed just that by describing how MIF itself had previously sued it in Bermuda on the Guarantee (and sued it a second time on the Mortgage). Under these circumstances, it would be absurd for MIF to contend that Bermuda was not an adequate forum. To the extent that the district court was concerned that this case involved BNYM as well, there is substantial authority for the court to sever a case against one defendant from another to facilitate a *forum non conveniens* dismissal. *See, e.g.*, *Rudersdal v. Harris*, 2021 WL 2209042, at *21 (S.D.N.Y. Feb. 27, 2021) (collecting cases for the proposition that "courts may sever claims to facilitate dismissal for *forum non conveniens*."). As it turns out, BNYM was not found liable, and the majority of MIF's case was ultimately against Hamilton.

*Public and Private Interests.* Finally, both the public and private interest factors favor dismissal. As to the public interest, as discussed above, this case implicates important sovereign interests. It involves a Bermuda municipality and a transaction to facilitate the development of a hotel by a Bermudian developer on Bermudian soil. Moreover, the key issue in the case is whether Hamilton had the power to enter the Escrow Agreement in the first place. As shown above, deciding that issue necessitates the proper interpretation of Hamilton's enabling statutes, Bermuda law, and whether Hamilton's involvement in the loan transaction fell within its scope. That is a job that Bermuda has a strong interest in being done by its courts. This is because the outcome of this case will impact the citizens and

taxpayers of Bermuda, as well as essentially decide, for a Bermuda municipality, what types of transactions it can or cannot enter into. Courts in this Circuit frequently dismiss cases like this one involving foreign entities when similar issues are present. *See, e.g.*, *BlackRock, Inc. v. Schroders PLC*, 2007 WL 1573933, at *10 (S.D.N.Y. May 30, 2007) ("New York jurors have no connection to this German dispute and should not be burdened with the duty of finding the facts of this case. Likewise, to the extent this case touches on the affairs of other people, those people are in Germany, not New York, further supporting trial in Germany rather than in the Southern District of New York.…This case implicates issues [relating to German laws], which are clearly of interest to Germany."); *Kato v. Ishihara*, 239 F. Supp. 2d 359, 366 (S.D.N.Y. 2002) (*forum non conveniens* factors favor a suit in Tokyo where the New York lawsuit was brought against a Tokyo municipality, suit had already been filed in Tokyo "concerning the same general matters" at issue, and the parties had appeared in the Tokyo court on at least three occasions).

The district court brushed aside this argument by asserting that this case has "a connection to New York." JA241. But the only connections the court identified concerned minor pieces of the transaction that were irrelevant to MIF's main claims. This Court has held that a slight connection to New York cannot outweigh a much greater connection to a foreign nation. *See Owens*, 2023 WL 3184617, at *5. These factors alone favor dismissal.

The private interest factors favor dismissal as well.[6]  That this case proceeded in New York required the parties to engage in "extensive" international discovery including obtaining multiple letters rogatory.  JA1447. And none of the numerous Bermuda witnesses involved in the underlying transaction testified live before the court.  JA1448.  Under these circumstances, dismissal was required.  *See Calavo Growers of Cal. v. Generali Belgium*, 632 F.2d 963, 967 (2d Cir. 1980) (private factors authorized dismissal where "breach of contract and fraud" claims "will necessitate an inquiry into the circumstances surrounding the formation of the contract" in Belgium).

Because the district court erred in its analysis of each of these points, its failure to dismiss this case on *forum non conveniens* grounds was an abuse of discretion and it must be reversed.

---

[6]  The district court improperly ignored these factors, apparently based on its view that where a forum selection clause is invoked, "only public—not private—factors may be considered."  JA241 (citing *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013)).  But this remains an open question in the Second Circuit.  This Court in *Martinez* correctly suggested that "Forum selection clauses pointing to foreign fora present distinct challenges not raised by clauses that merely point to other federal district courts" and so the private interest factors might be considered.  740 F.3d at 230.  Hamilton believes such private factors should be considered, but, even if they are not, Hamilton's compelling showing on public interest considerations is enough to warrant dismissal.

## CONCLUSION

The district court's judgment should be reversed.


Dated:  February 12, 2024                Respectfully submitted,

                                         *s/ David B. Salmons*

Kenneth I. Schacter                David B. Salmons
Simon Chang                      Brendan J. Anderson
MORGAN, LEWIS & BOCKIUS LLP      MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue                 1111 Pennsylvania Avenue, N.W.
New York, NY  10178             Washington, D.C. 20004
(212) 309-6000                 (202) 739-3000

                                           *Counsel for The Corporation of Hamilton*

60

**CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 13,845 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, Times New Roman 14-point font.

Dated:  February 12, 2024         *s/ David B. Salmons*
                                  David B. Salmons